UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

JOSEPH CARIA,

                    Plaintiff,

      v.

METRO-NORTH COMMUTER
RAILROAD,

                    Defendant.

</td></tr>
</table>

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 4/29/2020

No. 16-CV-9501 (RA)

OPINION & ORDER

     Plaintiff Joseph Caria, an employee of Defendant Metro-North Commuter

Railroad, brings this action alleging that Metro-North retaliated against him in violation

of the Federal Rail Safety Act (the "FRSA"), 49 U.S.C. § 20109.  Now before the Court

is Defendant's motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56.  As explained further below, because Plaintiff has not established that he

engaged in protected activity, the motion is granted.

## BACKGROUND[1]

     In 1985, Plaintiff began to work for Defendant's Power Department, a group

"responsible for installing and maintaining Metro-North's third rail power system."

Def.'s Reply 56.1 Stmt. ¶ 1.  Plaintiff had a number of positions over the years, but in

April 2013, he was promoted to Third Rail Supervisor – a position he remained in until

he retired.  As a Third Rail Supervisor, Plaintiff "was responsible for several groups of

---

[1] The following facts are drawn from Defendant's Rule 56.1 Statement ("Def.'s 56.1 Stmt."), Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1 Stmt."), Defendant's Reply to Plaintiff's Rule 56.1 Statement ("Def.'s Reply 56.1 Stmt."), and supporting documentation.  The facts are undisputed unless otherwise noted.  Where disputed, they are construed in the light most favorable to Plaintiff.  *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557. 566 (2d Cir. 2011).

employees, or 'gangs,' working on various projects involving installation, maintenance and repair of electrical equipment and electrical third rail." *Id*. ¶ 2. Because of his supervisory role, Plaintiff participated in several safety training courses, including an annual course on the Federal Railroad Administration ("FRA") "Roadway Worker Safety" rules. *See id.* ¶ 3; *see also* Dkt. 49, Ex. A (Transcript of Plaintiff's Deposition) at Tr. 16:15-18 ("We had annual courses, a book of rules . . . [a]nd annual classes and tests."). This training "defined" how a supervisor should report certain issues or incidents. Dkt. 49, Ex. E (Transcript of Pepitone's Deposition) at Tr. 32:2-6.

Plaintiff's responsibilities as a supervisor were broadly outlined in Defendant's "General Safety Instructions." *See* Dkt. 49, Ex. C ("General Safety Instructions"); *see also* Dkt. 53, Ex. B (Transcript of Coughlin's Deposition) at Tr. 49:17-19 ("The general safety instructions are safety rules that govern the work performed by [Defendant's] employees."). Section 200.2, entitled "Supervisor Responsibilities," provides that "[s]upervisors are responsible for the safety of the employees under their jurisdiction[,]" including by "[e]nsur[ing] that employees work in a safe manner consistent with all company safety rules, procedures, instructions, training practices, policies, and warnings" and "routinely observ[ing], correct[ing], and instruct[ing] employees to ensure compliance with all safety standards." Dkt. 49, Ex. C. Section 200.3, entitled "Reporting Incidents and Unusual Occurrences," requires "[e]mployees [to] immediately report all incidents and unusual occurrences arising from railroad operations or affecting railroad property that involve personal injury, property damage, or any threat to personal safety or to the safe and efficient operation of the railroad." *Id.* This rule encompasses "report[ing] near misses," defined as "any event arising from the operation of the

railroad, which under slightly different circumstances, could have resulted in injury or illness to any person[.]"  *Id.*

## I.   July 2015 Incident

In July 2015, several months prior to the event at issue in this action, Plaintiff was disciplined for violating his supervisory responsibility to report safety incidents.  On July 2, 2015, Plaintiff was overseeing a group of workers, when a section of the third rail was removed from an active track without the requisite track clearance, known as "foul time."[2]  *See* Dkt. 49, Ex. A at Tr. 58:5-8 (explaining that the group "picked up a piece of rail and . . . didn't have the proper foul time or something").  Plaintiff did not report the incident.[3]  After someone else reported it to the Occupational Safety and Health Administration, *see id.* at Tr. 58:18-20, Plaintiff was charged with seven disciplinary violations, including for violating Sections 200.2 and 200.3 of the "General Safety Instructions" and for his "[f]ailure to properly supervise employees under [Plaintiff's] direction and control" and "[c]onduct unbecoming a Metro-North Railroad employee." Dkt. 49, Ex. D (Investigation/Trial Waiver) (charging Plaintiff with "actions result[ing] in the performance of an unsafe task that threatened the personal safety of [him] and [his] subordinate employees" and for "fail[ing] to report this incident to [his] supervisors/managers as required").

On August 13, 2015, Plaintiff waived his right to challenge these charges and pled guilty to all seven violations.  *See id.*  In agreeing to waive his rights to an investigation and trial, Plaintiff also "agree[d] to the following conditions":

---

[2] At times, the record refers to this as the "Fordham incident."

[3] Plaintiff admits that he did not report the incident, but insists that was because his own supervisor, Richard Ranallo, "was at the scene of the incident and was indeed disciplined separately" for this.  Pl.'s 56.1 Stmt. ¶ 7.

- "I understand that as a supervisory employee, it is my primary responsibility to ensure the safety of my work gangs. I am required to follow all of [Metro-North's] safety rules . . . . I understand that the safety of the employees working under my direction should be my primary focus as we prepare for and perform work."

- "I understand that it is my responsibility to inform management when a safety violation occurs despite the fact that other supervisory employees are present at an incident."

*Id*. Upon pleading guilty, Plaintiff received a 45-day suspension, of which he served 15 days with the remaining 30 days noted on his record. *See id.*; Pl.'s Reply 56.1 Stmt. ¶ 10.

## II.   October 2015 Incident

On the morning of October 22, 2015, less than a month after Plaintiff returned from his suspension, one of Plaintiff's subordinates, Charles Ball, informed him that two Power Department trainees – Austen Pelkey and Jose Zuniga – had a verbal altercation when working on the tracks two days earlier, on October 20.[4]  *See* Dkt. 59, Supp. Ex. H (Transcript of Ball's Deposition) at Tr. 60:9-13.  By approximately 9:30 a.m. that morning, Plaintiff called and left a voicemail for Robert Aguirre, an employee in the Office of Diversity and Equal Employment Opportunity Department ("EEO/Diversity"). which primarily investigates complaints of discrimination and sexual harassment.[5]  *See* Dkt. 49, Ex. G (Oct. 7, 2014 E-Mail); Dkt. 53, Ex. B at Tr. 67:7-11 ("EEO and diversity,

---

[4] In response to Defendant's Rule 56.1 Statement, Plaintiff denies this fact even though he cites no basis for doing so.  *See* Pl.'s Reply 56.1 Stmt. ¶ 12.  Indeed, Plaintiff himself alleged this fact in his complaint, *see* Compl. ¶ 14 ("During the early morning of October 22, 2015, Mr. Caria was advised that two employees had had a verbal altercation[] while working in and around live track."), and continues to assert it in his own papers opposing summary judgment, *see* Pl.'s 56.1 Stmt. ¶ 37 (explaining that the altercation was "actually watched by Mr. Ball and reported to Mr. Caria, albeit two days later"); Pl.'s Opp. at 4 ("The incident in question occurred on October 20, 2015 and was not reported to Mr. Caria until the morning of October 22, 2015.").

[5] In his Rule 56.1 Statement, Plaintiff at first denies that he called Aguirre on October 22, 2015, but then admits it several paragraphs later.  *Compare* Pl.'s Rule 56.1 ¶ 14, *with id.* ¶ 20. Plaintiff also alleges that he called Aguirre in his complaint, *see* Compl. ¶ 15, and testified as much during his deposition, *see* Dkt. 49, Ex. A at Tr. 32:5-16.

they handle complaints and issues brought to their attention with regard to complaints of sexual discrimination, sexual harassment, protected categories, things of that nature."). Aguirre quickly forwarded Plaintiff's voicemail to Lorenzo Biagi, a manager in the Employee Relations Department.  Biagi subsequently notified management in the Power Department about the trainees' altercation on October 20.  *See* Def.'s Reply 56.1 Stmt. ¶ 21; *see also* Dkt. 49, Ex. F (Transcript of Ortiz' Deposition) at Tr. 9:10-13 (explaining that he "bec[a]me aware" of the October 20, 2015 incident "[t]hrough the department of . . . Employee Relations").  That morning, Biagi also contacted Plaintiff to schedule an appointment for the following day to discuss this matter.  *See* Dkt. 49, Ex. J (Oct. 22, 2015 E-Mail); Dkt. 53, Ex. A (Transcript of Biagi's Deposition) at Tr. 23:8-14.  Also on October 22, Plaintiff received a call from Ranallo, who asked him "what did you do." Dkt. 53, Ex. G (Transcript of Plaintiff's Deposition) at Tr. 45:18-20; *see also* Dkt. 53, Ex. E (Transcript of Ranallo's Deposition) at Tr. 60:2-3, 61:14-16 (explaining that he told Plaintiff that "management was mad that [Plaintiff] went to [EEO/Diversity] instead of coming to us first").

On November 9, 2015, charges were initiated against Plaintiff for failing to properly report the October 20, 2015 altercation between Zuniga and Pelkey.[6]  *See* Dkt. 49, Ex. K (Nov. 9, 2015 Notice of Action).  James Pepitone, the Director of the Power Department, helped determine whether charges should be issued against Plaintiff.  *See* Dkt. 49, Ex. E at Tr. 30:9-16, 31:22-25 ("[T]he discussion [r]evolved around the fact that Mr. Caria, being a seasoned operating supervisor for many years, did not report the incident directly to management, to the operating management.").  Plaintiff was

---

[6] Ball, who told Plaintiff about the incident, was not disciplined.  *See* Pl.'s 56.1 Stmt. ¶ 64.

specifically charged with three violations: (1) "[c]onduct unbecoming a Metro-North Railroad supervisory employee; [f]ailure to properly supervise employees under [his] direction and control" because he "failed to address the conduct of two subordinates, Austen Pelkey and Jose Zuniga, in an appropriate manner"; (2) "[v]iolation of Metro-North Railroad General Safety Instructions Section 200.2 (Supervisor Responsibilities)" because he "failed to provide appropriate corrective instruction to manage the situation directly, in dereliction of [his] supervisory responsibilities" after he was "advised of inappropriate and uncooperative behavior between two subordinates"; and (3) "[v]iolation of Metro-North Railroad General Safety Instructions Section 200.3 (Reporting Incidents and Unusual Occurrences) and prior existing waiver signed 8/13/15" because he "failed to report the[] conduct [of Pelkey and Zuniga] to [his] immediate supervisors." Dkt. 49, Ex. K; *see also* Dkt. 49, Ex. B (Transcript of Walsh's Deposition) at Tr. 14:10-13 ("[H]e should have addressed the safety concern on the track and he should have brought it to our attention, that we had employees that were not following safety rules on the tracks.").

On January 16, 2016, an investigative hearing, at which Plaintiff was represented by a union official, was held. Among those who testified were Danilo Ortiz, Plaintiff's manager, and Stephen Walsh, Ortiz' supervisor, who both explained that the waiver, which Plaintiff signed in connection with the July 2015 incident, had obligated him to report safety incidents to his supervisors within the Power Department. *See* Dkt. 49, Ex. H (Transcript of Jan. 2016 Hearing) at Tr. 23:25-24:2-5, 41:18-23, 89:17-25; *see also* Dkt. 53, Ex. F (Transcript of Ortiz' Deposition) at Tr. 13:22-25, 14:2 ("The communication process is that a supervisor working for a department – it could be power,

6

track, communication – they have an obligation to contact the department manager, general supervisor or whoever[.]").  Ranallo, Plaintiff's immediate supervisor, also testified that the waiver had obligated Plaintiff to notify management in the Power Department of any safety issues.  Ranallo further noted that his understanding of the waiver came from the fact that he too had signed that same waiver in connection with the July 2015 incident.  *See* Dkt. 49, Ex. H at Tr. 71:19-24.

In defending himself, Plaintiff insisted (and still insists here) that he reported the issue to management as required when he called Aguirre.  *See* Dkt. 49, Ex. H at Tr. 138:7-17; *see also id.* at Tr. 157:9:11 ("The safety instruction there tells you the same thing.  Doesn't say anything about going to power department managers.").  Plaintiff explained that he had recently attended a training led by Aguirre.  According to Plaintiff, during the training, Aguirre discussed "employee relations" and said "if two guys don't get along you could contact your foreman or supervisor or you could come directly to us and we'll handle[] it," Dkt. 49, Ex. A at Tr. 32:7-14, and therefore he could bypass his department.  *See also* Pl.'s 56.1 Stmt. ¶ 44 (explaining that Aguirre "had recently conducted a training class on railroad property making the [EEO] office available for resolution of employee v. employee disputes").  Plaintiff nonetheless acknowledged that he had not spoken about the incident with the two trainees and, "[o]ther than calling Robert Aguirre," did not "contact anyone else to report the issue about Pelkey and Zuniga that Charlie Ball told [him] about."  Dkt. 49, Ex. A at Tr. 37:6-21 (rejecting the notion that "[he] needed to report the issue to anyone within [his] own department, the Power Department").  In justifying his conduct, Plaintiff argued at the hearing that nothing more was necessary because the incident did not constitute "a safety issue" given that "[a]t the

time [he] was notified it was two days later." Dkt. 53, Ex. G at Tr. 79:11-12.

Following the January 2016 hearing, after reviewing the transcript and evidence, Pepitone concluded that the charges against Plaintiff were substantiated. *See* Dkt. 49, Ex. E at Tr. 36:8-11. Plaintiff was suspended for 61 days – a "permanent record type of discipline" because a suspension exceeding 60 days remains on an employee's record. *See id.* at Tr. 48:13, 48:24-25, 49:2-9. Notice of this discipline was sent to Plaintiff on February 11, 2016. *See* Dkt. 49, Ex. L (Feb. 11, 2016 Power Department Notice of Discipline). Plaintiff appealed the decision, but it was affirmed on April 8, 2016. *See* Dkt. 49, Ex. M (Apr. 8, 2016 Ltr.); *see also* Dkt. 53, Ex. B at Tr. 77:25-78:2-5 ("As an appellate level, we reviewed the penalty and determined that in light of Mr. Caria's previous offense and the waiver that he signed, that progressive discipline would yield a 61-day suspension as being appropriate."). In the appellate review process, it was determined that "[t]he issue is not that it was reported to employee relations. It's that it wasn't raised to the power department management to deal with it directly." Dkt. 53, Ex. B at Tr. 77:3-6.

On February 4, 2016, several days after receiving notice of this discipline related to the October 2015 incident, Plaintiff "was removed from service for [again] failing to report a serious safety incident, which had resulted in personal injury to an employee under his supervision." Def.'s Reply 56.1 ¶ 27; *see also* Dkt. 49, Ex. N (Feb. 4, 2016 Notice of Removal from Service). On February 9, 2016, Plaintiff was charged with additional violations of his supervisory responsibility – this time relating to this more recent failure-to-report incident. *See* Dkt. 49, Ex. O (Feb. 9, 2016 Notice of Charges).

Some time after receiving these new charges, Plaintiff filed an application for a

disability retirement with the Railroad Retirement Board ("RRB").  *See* Dkt. 49, Ex P

(Plaintiff's Disability Application).  Plaintiff listed February 29, 2016 as the day that his

"condition[s]" – described as "hearing loss, hypertension, diabetes, CAD – Coronary

Artery Disease, depression, anxiety, cervical disc protrusion, thoracic back pain" –

"began to affect [his] ability to work."  *Id.* (emphasis omitted).  On August 30, 2017,

Plaintiff's application was approved, and he resigned with a full pension.  *See* Def.'s

Reply 56.1 Stmt. ¶ 29.

On December 9, 2016, Plaintiff filed this action.  *See* Dkt. 1.  Defendant filed an

answer on February 10, 2017.  *See* Dkt. 7.  After extended discovery, on September 10,

2019, Defendant moved for summary judgment.  *See* Dkt. 57.  Plaintiff opposed the

motion on October 12, 2019, *see* Dkt. 52, and Defendant filed a reply on October 28,

2019, *see* Dkt. 58.

## LEGAL STANDARD

Summary judgment is warranted if the movant shows that "there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under

the governing law'" and genuinely in dispute if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Roe v. City of Waterbury*, 542 F.3d

31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).

The moving party bears the burden of showing that it is entitled to summary

judgment.  *See Anderson*, 477 U.S. at 256.  The Court is "required to resolve all

ambiguities and draw all permissible factual inferences in favor of the party against

whom summary judgment is sought." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012). In conducting this inquiry, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

## DISCUSSION

The FRSA was enacted "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101; *see also CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 661 (1993). To effectuate this, the statute prohibits a railroad carrier from "discharg[ing], demot[ing], suspend[ing], reprimand[ing], or in any other way discriminat[ing] against an employee" who engages in certain conduct, including – as relevant here – "reporting, in good faith, a hazardous safety or security condition." *Id.* at § 20109(b)(1)(A).

Courts evaluate FRSA retaliation claims under a burden-shifting framework.[7] Therefore, to establish a *prima facie* claim for retaliation under the FRSA, a plaintiff must demonstrate, by a preponderance of the evidence, that (1) he engaged in a protected activity, (2) the employer knew of that protected activity, (3) he suffered an adverse employment action, and (4) the protected activity was a contributing factor in the employer's decision. *See March*, 369 F. Supp. 3d at 531-32. The fourth element

---

[7] In 2007, the FRSA was amended to "expand[] the scope of the anti-retaliation protections." *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3d Cir. 2013). In addition to removing the requirement that all railroad carrier employees were first subject to mandatory dispute resolution, the amendments also added additional anti-retaliation provisions. One addition was to explicitly incorporate into the FRSA the burden-shifting framework applicable to retaliation claims brought pursuant to the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (the "AIR-21"), 49 § U.S.C. 42121(b). *See* 49 U.S.C. § 20109(d)(2)(A) ("Any action under paragraph (1) shall be governed under the rules and procedures set forth in section 42121(b)[.]"); *see also March v. Metro-North R.R. Co.*, 369 F. Supp. 3d 525, 533 (S.D.N.Y. 2019) ("[T]he FRSA is governed by the burden-shifting framework set forth in the [AIR-21].").

regarding causation "does not generally require proof of the employer's retaliatory motive," although "[a]t bottom, the essence of a retaliation claim under the FRSA is 'discriminatory animus.'"  *Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017) (quoting *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014)); *see also Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 (7th Cir. 2018) (explaining that, while the FRSA's "'contributing factor' standard is lower than those applied in other anti-discrimination contexts, . . . it does not eliminate the need to demonstrate the existence of an improper motive" (internal citation omitted)); *Araujo*, 708 F.3d at 158 ("FRSA burden-shifting is much more protective of plaintiff-employees than the *McDonnell Douglas* framework.  The plaintiff-employee need only show that his protected activity was a 'contributing factor' in the retaliatory charge or discrimination, not the sole or even predominant cause.").  "Failure to satisfy any one of the *prima facie* requirements is fatal to a claim."  *March*, 369 F. Supp. 3d at 532*.*  If a plaintiff establishes a *prima facie* case, "the burden then shifts to the employer to show, 'by clear and convincing evidence,' that it would have taken the same action in the absence of the protected activity."  *Id.* (quoting *Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 107 (4th Cir. 2016)).

Here, Defendant does not dispute that Plaintiff suffered an adverse employment action – the second element of the FRSA's burden-shifting framework.  *See* Def.'s Mot. at 11 ("Metro-North does not dispute that it took adverse employment action against Caria when it disciplined him[.]").  It nonetheless contends that Plaintiff "cannot establish the remaining elements of a prima facie retaliation case."  *Id.* at 12.  Because the Court agrees with Defendant that Plaintiff cannot demonstrate the framework's first element by

a preponderance of the evidence – namely, that he engaged in protected activity –

because he did not subjectively believe he was reporting a safety issue at the time, the

Court addresses only that element below.

## I.      Whether Plaintiff Engaged in Protected Activity

Defendant first argues that it is entitled to summary judgment because Plaintiff

cannot demonstrate he engaged in protected activity pursuant to the FRSA.  *See* Def.'s

Mot. at 12-14.

### A.  Standard for Engaging in Protected Activity Under the FRSA

To show that he engaged in protected activity under the FRSA, Plaintiff must

demonstrate that he "report[ed], in good faith, a hazardous safety or security condition."

49 U.S.C. § 20109(b)(1)(A).  There is some dispute as to what this statutory language

requires Plaintiff to demonstrate.  Citing recent cases in this circuit, Defendant urges the

Court to hold "that the FRSA's 'good faith' requirement includes both subjective and

objective components."  Def.'s Mot. at 12 (noting that courts have "recently endorsed

th[is] conclusion").  Plaintiff has not addressed this issue directly.[8]  *See* Pl.'s Opp. 13.

The Second Circuit has not yet opined on the FRSA's framework, or this statutory

language in particular.  *See March*, 369 F. Supp. 3d at 533; *see also Young v. CSX

Transp.*, 42 F. Supp. 3d 388, 394 (N.D.N.Y. 2014) ("The Second Circuit has not yet

analyzed AIR-21's burden-shifting framework in the context of a whistleblower

retaliation claim brought pursuant to the FRSA.").  However, several courts in this circuit

---

[8] The closest Plaintiff comes to addressing this issue is to say that "Mr. Caria'[s] actions
qualify as protected activity because . . . he provided information to those with supervisory
authority over him who had the authority to investigate the misconduct" and "he reported, in good
faith, hazardous safe conditions."  Pl.'s Opp. at 13.  This argument, however, merely parrots the
FRSA's text and offers no explanation as to what Plaintiff believes the requisite showing to be.
*See* 49 U.S.C. § 20109(a)(1)(C); *id.* at § 20101(b)(1)(A).

have considered how a plaintiff must establish that she engaged in protected activity under the FRSA.  Each has concluded that, "[t]o count as protected activity under [§] 20109(b)(1), Plaintiff must 'establish that his good faith belief in a safety hazard was subjectively *and* objectively reasonable.'"  *Gonzalez v. Metro-North Commuter R.R.*, No. 18-CV-10270 (CM), 2020 WL 230115, at *5 (S.D.N.Y. Jan. 15, 2020); *see also Ziparo v. CSX Transp., Inc.*, No. 17-CV-708, 2020 WL 1140663, at *17 (N.D.N.Y. Mar. 9, 2020) ("To establish the first element of this claim, a plaintiff must show that he had a reasonable belief that the activity he was reporting was a hazardous safety or security condition, which requires a showing that the belief was both objectively and subjectively reasonable."); *March*, 369 F. Supp. 3d at 531 ("[T]o establish the first element of a *prima facie* claim, Plaintiff must establish that his good faith belief in a safety hazard was subjectively *and* objectively reasonable."); *Necci v. Long Island R.R. Co.*, No. 16-CV-3250, 2019 WL 1298523, at *15 (E.D.N.Y. Mar. 21, 2019) (explaining that, "[t]o establish that a refusal to work is protected," the FRSA "contains both subjective and objective components"); *Hernandez v. Metro-North Commuter R.R. Co.*, 74 F. Supp. 3d 576, 580 (S.D.N.Y. 2015) ("A plaintiff must 'show not only that he believed the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation.").[9]

In reaching this conclusion that the protected activity requirement encompasses both objective and subjective components, these courts have analogized the FRSA to

---

[9] At least one court of appeals has also concluded as much.  *See Lillian v. Nat'l R.R. Passenger Corp.*, 259 F. Supp. 3d 837, 843 (N.D. Ill. 2017) (citing *Lang v. Nw. Univ.*, 472 F.3d 493, 495 (7th Cir. 2006)) ("As stated earlier, the [FRSA] protects an employee from adverse action when reporting, in good faith, a hazardous safety or security condition.  Our Court of Appeals has held that 'good faith,' as that concept was at issue in a different whistleblower statute, contains both a subjective and objective component.").

other whistleblower statutes, including the Sarbanes Oxley Act, 18 U.S.C. § 1514A, that also incorporate the burden-shifting framework set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (the "AIR-21"), 49 § U.S.C. 42121(b). *See March*, 369 F. Supp. 3d at 533; *see also Ziparo*, 2020 1140663, at *21 (stating that "cases assessing whistleblower claims under the Sarbanes-Oxley Act and the Consumer Product Safety Improvement Act . . . require proof of the same elements as a claim under the FRSA").  From there, the courts have recognized that, when analyzing these other whistleblower statutes, "the Second Circuit Court of Appeals has determined that a 'reasonable belief contains both subjective and objective components.'"[10] *March*, 369 F. Supp. 3d at 533; *Hernandez*, 74 F. Supp. 3d at 580 ("In whistleblower claims brought pursuant to other statutes, the Second Circuit Court of Appeals has determined that a 'reasonable belief contains both subjective and objective components.'" (citation omitted)); *Ziparo*, 2020 WL 1140663, at *21 (same).

The Court agrees with the conclusion reached by other district courts in this circuit.  In addition to the Second Circuit's analysis of similar whistleblower retaliation statues, the Court rests this determination on a natural reading of the statutory text – to protect employees who "report[], in good faith, a hazardous safety or security condition," 49 U.S.C. § 20109(b)(1)(A) – and a logical extension of the FRSA's purpose – "to ensure

---

[10] One example *is Nielsen v. AECOM Technology Corp*., 762 F.3d 214 (2d Cir. 2014), in which the Second Circuit reviewed a whistleblower retaliation claim brought under the Sarbanes-Oxley Act to determine if the plaintiff had sufficiently alleged that he had engaged in protected activity.  Explaining that "[t]he statute does not specify what, in particular, a purported whistleblower must establish to demonstrate that criminal fraud or securities-related malfeasance is afoot," it noted that "§ 1514A's 'critical focus is on whether the employee reported conduct that he or she reasonably believes constituted a violation of federal law." *Id.* at 221.  As such, the Second Circuit concluded that "a reasonable belief," under § 1514A, "contains both subjective and objective components," requiring a plaintiff to "show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation." *Id.*

that employees can report their concerns without the fear of possible retaliation or discrimination from employers," H.R. Rep. No. 110-259 at 348 (2007), 2007 U.S.C.C.A.N. 119, 180-181.  As such, under the FRSA, a plaintiff seeking to establish that he engaged in protected activity under § 20109(b) must demonstrate that he had a subjectively and objectively reasonable belief that he was reporting a safety condition.

### B.  Application

Applying that conclusion here, the Court agrees with Defendant that Plaintiff cannot demonstrate that he engaged in protected activity when he reported the altercation between Pelkey and Zuniga on October 22, 2015.  *See* Def.'s Mot. at 12.  As previously explained, a necessary element of a successful FRSA claim is that Plaintiff "held the requisite belief about the existence of a specific hazardous safety condition at the time he made his [report] . . . in order to establish a protected activity based on that specific 'hazardous safety or security condition.'"  *Ziparo*, 2020 WL 1140663, at *21.  Here, however, there is no genuine dispute of fact that Plaintiff did not subjectively believe he was reporting a safety issue at the time he did so.

That Plaintiff did not believe he was reporting a safety issue and thus cannot satisfy the subjective component here is first evidenced in his testimony at the January 2016 investigative hearing.  During the hearing, Plaintiff admitted that he reported the issue to EEO/Diversity – and not to any other person or department – because he did not believe the report involved a safety issue.  He was directly asked, for instance, whether in his opinion "two guys not getting along" constituted "a safety issue."  Dkt. 49, Ex. H at Tr. 141:2-4.  Plaintiff responded:  "Why is it a safety issue?  Two days later, nothing happened."  *Id.* at Tr. 141:5-6; *see also id.* at Tr. 157:11-14 ("And this was an issue with

two guys not getting along where I was told in a class that we could go directly to [EEO/Diversity], we do not have to go to management."); *see also* Def.'s Mot. at 5-6 (quoting Plaintiff's testimony from the January 2016 hearing).

Testimony from Plaintiff's deposition in this action is even more telling.  There, Plaintiff once again – and repeatedly – confirmed that he did not believe that he was reporting a safety issue on October 22, 2015.  For example, he was asked "whether [there was] a question in [his] mind as to whether Pelkey and Zuniga's conduct was a safety issue," to which he responded that "[a]t the time I was notified it was two days later.  It wasn't a safety issue then."  Dkt. 49, Ex. A at Tr. 79:8-12.  Shortly after that statement, Plaintiff repeated this same sentiment: "When they are on the tracks arguing[,] it's a safety issue.  When I am notified two days later[,] it's passed.  How can it be a safety issue when I'm notified two days later?"  *Id.* at Tr. 81:20-23.  Plaintiff testified to this point several more times throughout his deposition.  *See id.* at Tr. 82:2-3 (confirming that he "did not consider it a safety issue because it was two days later"); *id.* at Tr. 84:13-17 (agreeing that it is "accurate to say that what [he] reported to EEO and Employee Relations, [he] did not consider it to be a safety issue"); *id.* at Tr. 115:4-6 ("When you're off the track and you find out two days later, it's not a safety [issue] no more.  But on the track it's unsafe."); *id.* at Tr. 190:6-9 ("[W]hile it's on the track it's an immediate safety issue.  Two days after the fact that I'm finding out, the safety issue is gone.  But to continue once you're on there, of course it's safety.").  Indeed, Plaintiff even admitted that he had not realized his report involved a safety issue until months after he called Aguirre: "Now I know it's a safety issue.  I didn't know that until the trial."  *Id.* at Tr. 88:21-22 (referring to his January 2016 hearing).  Based on this evidence, the Court

concludes that Plaintiff's own admissions establish that he did not believe on October 22, 2015 that he was reporting "a hazardous safety or security condition," 49 U.S.C. § 20109(b)(1)(A), and thus his "own testimony is fatal to his case," Def.'s Mot. at 12. *See also Ray v. Union Pac. R.R. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013) ("[E]ven assuming that Plaintiff was dishonest with Defendant on one occasion or another, the relevant inquiry remains whether, *at the time he reported his injury* to Defendant, Plaintiff genuinely believed the injury he was reporting was work-related.").

This case presents circumstances similar to those in previous FRSA cases in this district. In *Hernandez v. Metro-North Commuter Railroad*, 74 F. Supp. 3d 576 (S.D.N.Y. 2015), for example, reviewing a whistleblower retaliation claim under the FRSA, the court granted summary judgment to the defendant after finding that the plaintiff failed to establish that he had engaged in protected activity. Like here, there was no doubt that the plaintiff had made a report of an employment-related issue. *See id.* at 580 (noting that the it "cannot question that [the plaintiff] honestly believed the conduct reported was an 'unlawful use of company time'"). The court nonetheless deemed this insufficient because "[t]here [wa]s no indication in the record that the plaintiff considered that working on a personal car on company time might be a safety concern when he made the report to the IG." *Id.* As such, the court held that the defendant was entitled to summary judgment because "the plaintiff has failed to establish even a subjectively reasonable belief that would satisfy this prong of the statute." *Id. Hernandez*'s analysis is equally applicable here.[11]

---

[11] Another case presenting similar facts is *Ziparo v. CSX Transportation, Inc.*, No. 17-CV-708, 2020 WL 1140663 (N.D.N.Y. Mar. 9, 2020). There, the court determined that, "[b]ased on the admissible record evidence, Plaintiff has not established that he believed he was reporting a hazardous safety condition as a result of the falsification of data specifically because of an

Despite this record evidence, Plaintiff now asserts that he had believed his report to involve a safety issue when he called Aguirre.  In his Rule 56.1 Statement, he asserts that he "repeatedly testified that the on-track arguing no-longer presented an imminent safety risk, but still presented a safety hazard for the future if left unaddressed, hence his report of the safety concern."  Pl.'s 56.1 Stmt. ¶ 17; *see also id.* ¶ 46 ("Mr. Caria reported the Zuniga/Pelkey issue to both Mr. Aguirre and Mr. Biagi as a safety issue, because with on-track bickering, something is going to happen.").

This assertion, however, offers too little too late.  The only evidence that Plaintiff cites to is four lines of his deposition testimony, which conflict with his other deposition testimony, as well as statements he made at the January 2016 hearing before filing this action and before it was in his interest to claim he was reporting a safety issue.  *See id.* ¶ 46 (citing Dkt. 53, Ex. G at Tr. 189:16-23).  Below is the cited colloquy, with questions asked to Plaintiff by his own counsel:

> Q:  Okay.  And when you reported to originally Mr. Aguirre and then obviously Biagi, did you discuss it with them in terms of being a safety issue?
>
> A:  Yeah.
>
> Q:  Why?
>
> A:  Because it's on track bickering and something is going to happen and it's unsafe.

Dkt. 53, Ex. G at Tr. 189:16-23.  But in citing these lines, Plaintiff omits his subsequent testimony, which contradicts the assertion that he believed he was reporting a safety issue at the time:

---

inability to locate railcars." *Id.* at *21.  And while "[t]he fact that falsification of location information . . . might constitute a 'hazardous safety or security condition' in certain circumstances," the court held that it "does not negate the fact that Plaintiff is required to show that he *actually believed* it to be a 'hazardous safety or security condition' at the time he made his complaints." *Id.* at *22.

Q: Okay.  So when you said that you're hearing that it wasn't a safety issue, what did you mean by that?

A: Because I was notified two days later.

Q: Okay.  And what do you mean – how could it be both a safety issue and not a safety issue?

A: Well, while it's on the track it's an immediate safety issue.  Two days after the fact that I'm find out, the safety issue is gone.  But to continue once you're on there, of course it's safety.

*Id.* at Tr. 189:24-25, 190:2-9.  Nor does Plaintiff acknowledge – let alone attempt to reconcile – this single portion of his deposition testimony with his many other statements, which were discussed and cited above, making clear that he did not believe at the time of his report that the trainees' altercation involved a safety issue.  Most consequently, earlier in his deposition, he admitted that, while "[n]ow [he] know[s] it's a safety issue," he "didn't know that until the trial."  Dkt. 49, Ex. A at Tr. 88:21-22.  This statement – on top of the many others he made during his deposition, as well as what he testified to during the January 2016 hearing – leaves no genuine dispute of fact that Plaintiff cannot satisfy the requisite subjective component.

Furthermore, the Court notes that – with the exception of these four lines from his deposition – Plaintiff points to no other evidence in the record establishing this subjective component.  At the summary judgment stage, however, many courts have deemed it necessary to cite to more than one's own deposition testimony to create a genuine dispute of fact.  *See Kunik v. N.Y.C. Dep't of Educ.*, No. 15-CV-9512 (VSB), 2020 WL 508897, at *7 (S.D.N.Y. Jan. 31, 2020) ("In the face of contemporaneous evidence in Plaintiff's own words, her self-serving comments from her deposition after the filing of this lawsuit cannot create an issue of fact[.]"); *Lozada v. Delta Airlines, Inc.*, No. 13-CV-7388 (JPO), 2014 WL 2738529, at *5 (S.D.N.Y. June 17, 2014) ("Although the Court cannot resolve

issues of credibility on summary judgment, [the plaintiff's] self-serving, incomplete, and inconsistent recollection is not sufficient to create a genuine dispute of fact in light of [the defendant's] documented evidence."); *see also Deebs v. Alstom Transp., Inc.*, 364 F. App'x 654, 656 (2d Cir. 2009) (affirming the grant of summary judgment because "both plaintiffs rely almost exclusively upon their own deposition testimony in order to support their claims" and "[s]uch evidence is insufficient to defeat summary judgment").

The Court does not doubt that it would have been objectively reasonable for Plaintiff to have perceived the trainees' altercation as presenting a safety or hazardous condition.  Stephen Walsh, for example, a supervisor in the Power Department, testified that, even if a hazardous condition is not immediately present because an altercation has ended, "it now presents a potential safety hazard in the future."  Dkt. 53, Ex. F (Transcript of Walsh's Deposition) at Tr. 31:16-25.  And the Vice Present and Chief Safety Officer of Metro North confirmed that, "[t]o the extent that a foreman or supervisor learns about an incident after the fact, meaning they are no longer on the track, learns about it after the fact, [she] would [] still expect him to address it once he learned about it," even though "the imminent safety threat is gone."  Dkt. 53, Ex. C (Transcript of Kirsch's Deposition) at Tr. 35:8-18.

Nonetheless, for the reasons stated above, there is no genuine dispute of fact that Plaintiff did not *subjectively* believe that he was reporting a safety issue on October 22, 2015.  *See Ziparo*, 2020 WL 1140663, at *21 ("There is simply no way to assess whether a belief was reasonable without considering specifically the circumstances at the time the belief was had (i.e., when the protected activity occurred).")  Plaintiff, therefore, cannot establish that he engaged in protected activity and make a *prima facie* case under the

FRSA.  Summary judgment is thus appropriate here because, "after drawing all reasonable inferences in favor of [P]laintiff, no reasonable jury could find that [P]laintiff has proved all of these elements."  *Hernandez*, 74 F. Supp. 3d at 579.   Accordingly, without elaborating on the FRSA's remaining elements, the Court concludes that summary judgment is warranted here.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted. The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 47 and close the case.

Dated:      April 29, 2020
            New York, New York

                                                    _____
                                                    Ronnie Abrams
                                                    United States District Judge